Savarona Ship Corporation v. Commissioner.
Savarona Ship Corp. v. Commissioner
Docket No. 103395.
United States Tax Court
1942 Tax Ct. Memo LEXIS 89; 1 T.C.M. (CCH) 89; T.C.M. (RIA) 42596; November 12, 1942
*89 Petitioner's activities of managing and attempting to charter or sell a large yacht which was not used during the taxable year or several preceding years and which had been constructed primarily for the pleasure of petitioner's principal stockholder, who financed its construction, held not to constitute the carrying on of a trade or business. L. A. Luce, Esq., Munsey Bldg., Washington, D.C. for the petitioner. F. S. Gettle, Esq., and Thomas E. Lewis, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion An income tax deficiency of $12,539.60 for the year 1937 resulted from the Commissioner's determination that depreciation of a yacht and expenditures for its maintenance were not deductible, since the yacht was not used nor the expense incurred in any trade or business. Whether this determination was correct is the only issue to be decided. Petitioner's return for the year involved was filed with the Collector for the second district of New York. Findings of Fact Mrs. Emily R. Cadwalader, owner of the private yacht Savarona, caused the organization of petitioner under the laws of the State of New York on March 29, 1928, and transferred to it title to a yacht *90 in exchange for 1,000 shares of its no par value common stock, being all of petitioner's stock. Her reasons for doing this were to relieve herself of personal liability for damages in the event of accident and of the burden of supervising the details of the yacht's operation and management, as well as to avoid personal business dealings in connection with the chartering of the vessel. The articles of incorporation were drawn up by Mrs. Cadwalader's attorneys, the firm of Noble, Morgan & Scammell. Much of the work was done by Thomas Campbell, a young man just out of law school who was employed by the firm. Campbell was chosen secretary and treasurer of petitioner, Mrs. Cadwalader was chosen president, and her husband, Richard M. Cadwalader, Jr., was chosen vice president. The corporation had no employees other than its officers and the officers and crew of the yacht. Its place of business was the office of Mrs. Cadwalader's attorneys, the rent of which was paid by the attorneys. Its officers and directors did not receive salaries. Meetings of the directors and of the stockholders were held from time to time, but Mrs. Cadwalader seldom attended in person. After the boat's transfer *91 to petitioner an unsuccessful effort was made to secure a manager for the corporation. Mrs. Cadwalader used the yacht from time to time until June 1929, under an arrangement that she would finance the upkeep of the boat. Under this arrangement Mrs. Cadwalader paid petitioner $118,000 in 1928 and approximately $60,000 in the first five months of 1929. The expense of operating the boat in 1928, excluding depreciation, was approximately $108,000. No formal charter party was executed with Mrs. Cadwalader. The vessel was listed for charter with two yacht brokers in New York City, one of whom (the builder of the boat) paid petitioner $3,000 on November 7, 1928, for the use of the Savarona for a few days to demonstrate her to clients who were interested in building and chartering yachts. Several proposed charters were received by petitioner, but none of them was consummated. One of the brokers presented a client who was willing to charter the yacht for two months during the summer of 1929 at $50,000 per month, and the other broker submitted a proposal for three months at the same charter rate. The latter offer was accepted, and on June 4, 1929 petitioner chartered the Savarona to one Thompson *92 for three months at $50,000 per month, with an option, for which Tompson paid $25,000, to purchase the yacht for $1,800,000. Shortly after petitioner's receipt of the first month's charter hire, approximately $50,000 was paid over to Mrs. Cadwalader and treated as a loan from petitioner to her. The option to purchase was exercised by Thompson about the first of August 1929, and the purchase price of $1,800,000, less the $25,000 paid for the option and a small amount of unused charter hire, was paid to petitioner in cash. Of this amount something in excess of $1,700,000 was paid over to Mrs. Cadwalader and treated as a loan from petitioner to her. Petitioner reported a profit on the sale in its return for 1929. As soon as the option was exercised negotiations and preparations were begun for building a new yacht. Campbell became increasingly active in the project and, upon frequent consultation with Mrs. Cadwalader, handled the details of the negotiations, supervised and approved the drawing of the specifications, and executed the contracts in behalf of petitioner. The original plans were found to be unsatisfactory, so that the task of designing the new vessel was entrusted to one *93 of the outstanding naval architects and marine engineers in the United States. The boat was constructed by the firm of Blohm & Voss, of Hamburg, Germany, and was christened the "Savarona," hereinafter known as the new Savarona. Construction was completed in the latter part of July 1931, at a cost in excess of $2,100,000. The cost was paid in part from the money received from Thompson for the first Savarona, which was repaid to petitioner by Mrs.cadwalader, and in part from additional funds advanced by Mrs. Cadwalader. The new Savarona was an extraordinarily large yacht, approximately 450 feet in length, with a gross tonnage of 4,646 tons. It was designed as an oceangoing vessel that would meet the highest standards for safety, and it received the highest rating given by Lloyd's and the British Board of Trade. In addition to the owner's special apartment consisting of bedrooms, sitting rooms, and baths, the boat had twelve staterooms, each with a private bath or shower, a dining salon approximately 31feet X 26feet, a smoking room approximately 15feet X 20feet, a card room approximately 13feet X 13feet, a sun room approximately 35feet X 24feet, a living room approximately 32feet X 28feet, *94 a lounge approximately 23feet X 24feet, a veranda approximately 17feet X 21feet, 4 rooms with connecting baths for maids and valets, and a maids' sitting room. There were also accommodations for four officers and a crew of about sixty-five. The new Savarona was not acquired as an investment nor with the expectation that a profit would be derived from its operation or use. While the primary purpose was to use it for Mrs. Cadwalader's pleasure, it was also hoped that by chartering it from time to time some part of the costs of operation and maintenance would be recouped. While it was being built it was listed with an outstanding yacht brokerage firm in New York City with a view to future chartering. Petitioner employed the necessary officers and crew for the ship and it was taken on its "shakedown" cruise to Norway and back to Hamburg. Mrs. Cadwalader formally chartered the boat for this purpose, paying $25,000 for a charter of approximately one month. She and Mr. Cadwalader were the only representatives of petitioner to take this cruise. Minor adjustments were then made to the yacht by the builders, and in October 1931 Mr. and Mrs. Cadwalader crossed to Bermuda in it. Campbell had *95 been attempting to interest one of his personal friends, a Mrs. Moore, in chartering the boat, and a charter was executed with her on December 22, 1931, for a period of two months beginning January 15, 1932, for the sum of $110,000. On December 23, 1931, petitioner's board of directors authorized a charter to Mrs. Cadwalader for two periods approximating one month for the sum of $25,000. The first period, from January 2 to 15, 1932, was a trip to Havana, and the second period was from April 12 to 30, 1932. In December 1932 Mrs. Cadwalader sold 400 shares of petitioner's stock to Campbell for the sum of $40,000. The sale was made at the time to establish a loss for tax purposes. Through the taxable year 1937 Mrs. Cadwalader continued to own 600 shares and Campbell continued to own the remaining 400 shares. Campbell became president of petitioner during 1932, retaining in addition his position as treasurer; and an attorney having offices with Campbell, one James P. Smith, became secretary during the same year. These offices were held by the same individuals through the year 1937. Campbell had resigned his association with the firm of Noble, Morgan & Scammell in 1930 to open his own *96 law office, and thereafter he was Mrs. Cadwalader's attorney and financial agent, in whom she reposed absolute confidence. Mrs. Cadwalader died in May 1941. Due primarily to the economic depression the new Savarona was not used from the end of April 1932 through the year 1937, except for a short charter in 1933 to a German motion picture company in connection with the making of a picture, for which petitioner received $28,000. During this period most owners of large yachts refrained from using them. In the latter part of 1932 Mrs. Cadwalader was willing that the yacht be chartered or sold, though she was not willing that it be sold at a sacrifice. The vessel was returned to Hamburg because it could be berthed there free of charge. Petitioner kept four officers and a skeleton crew of approximately 16 men on board at all times during these years in order to properly maintain the boat and thereby prevent its rapid deterioration. Maintenance expenses for the year 1937 amounted to $71,411.64, and were necessary and proper whether the boat was to be used for pleasure or business purposes. In January 1930 petitioner opened a stock trading account and from 1930 through 1937 it bought and *97 sold securities on the market. The funds required for such trading were supplied by Mrs. Cadwalader, and the purpose in so doing was to furnish petitioner a fund with which to pay the expenses of the yacht. In some of the years it realized gains from securities transactions and in others it sustained losses. During 1937 the losses exceeded one million dollars. During the years 1933 through 1937 the new Savarona was listed for charter or sale with various yacht brokers and agents in the United States and Europe. Various proposals were submitted to petitioner's officers by or through these brokers and a good deal of correspondence resulted. Several inquiries were received regarding the possible charter of the boat for commercial purposes. These were either rejected by petitioner or failed for other reasons to materialize. Petitioner's officers advised at least two prospective charterers that their proposition would be prohibitive in view of the necessity of reconditioning the Savarona for yachting after the charter period. The Turkish Government began negotiations in 1935 for the purchase of the boat, and Campbell advised the captain of the yacht, who was in charge at Hamburg, that *98 petitioner was unwilling to consider chartering the boat except upon very favorable terms, because of the possible prevention of a sale. Negotiations with the Turkish Government finally resulted in the sale to it of the Savarona in February 1938 for $1,000,000. Depreciation of the new Savarona for 1937 when computed at 5 percent per annum, as is correct, amounted to $106,967.93. Opinion ARUNDELL, J.: The issue is whether petitioner was engaged in the trade or business of chartering and selling the Savarona during 1937. Only if it were could depreciation and the cost of maintaining the yacht be deducted. This is not like Trustee Property No. 4, ; ; and , cited by petitioner. In each of those cases the taxpayer was engaged in a trade or business having no connection with the operation of a boat for profit, and the issue was whether the cost of maintaining a yacht was a necessary and ordinary expense incident to the conduct of that business. Here, however, the test is whether the ownership and use of the yacht *99 itself can be said to have constituted the carrying on of a trade or business. Notwithstanding conflicting evidence, we think the record as a whole supports respondent's determination and that the question must be answered in the negative. If any one factor is decisive in resolving the oft-litigated question of whether a trade or business is being conducted, it is the presence or absence of a profit motive. ; . "The real test is whether the operation was carried on as a business for gain or whether it was carried on for recreation or pleasure. And this question is largely a matter of the intent of the petitioner. Thomas Sheridan, supra [ 4 B.T.A. 1299; ." . See . In our opinion such a motive was lacking here. It is true that Campbell testified that in 1929 the officers and directors decided to build the new Savarona because "we believed *100 we could make money." But we are unable to attach any weight to this statement in view of the unequivocal testimony of Mrs. Cadwalader, who from 1929 through 1931 owned all of petitioner's stock, was its president, and completely financed the construction of the vessel. Her testimony is clear that the vessel was constructed primarily for her pleasure and that any idea of chartering it was merely to reduce the operating expenses. She did not put money into the boat for the purpose of making a profit. Coupled with this is the opinion of a yacht broker of forty years' experience that a yacht like the new Savarona could not produce a profit from its operation over the years of its useful life. Petitioner's primary reliance is upon the negotiations had with various brokers for the chartering or sale of the yacht during the years 1933 to 1937; and upon the assertion that the boat was abandoned in 1932 as a pleasure craft. The latter contention is entirely without support in the record. The fact that Mrs. Cadwalader never used the yacht after 1932 is no more persuasive in petitioner's favor than is the failure to secure others to ride upon it decisive against petitioner. Both are adequately *101 explained by the prolonged economic depression, which, as a matter of common knowledge, supported by affirmative evidence in this instance, seriously curtailed and even eliminated the use of such luxuries as the new Savarona. The mere non-use by itself does not show an abandonment of the yacht for pleasure purposes; and indeed, the contrary appears from correspondence placed in evidence by petitioner, which demonstrates that in considering proposed commercial charters petitioner's officers had in mind the necessity of reconditioning the vessel thereafter for yachting purposes. The listing of the vessel for charter with various brokers does not, in our judgment, demonstrate that a trade or business was being conducted. Maintenance expenses, which the evidence shows were necessary and proper regardless of whether the purpose thereafter was to charter, sell or use the boat for pleasure, continued at a high rate even though the yacht remained idle. They exceeded $70,000 during the tax year. It is only natural that the owner of such an asset would seek means of reducing or recouping those expenses. The efforts to do so do not result in the carrying on of a trade or business unless they *102 amount to a devotion of the property to commercial purposes. Even if a profit motive were conceded, the mere listing of property with an agent for rent or for sale does not render the transactions one entered into for profit. , certiorari denied, ; , certiorari denied, . A fortiori, it does not result in the operation of a trade or business. , affd. on another issue, , certiorari denied, ; . The correspondence upon which petitioner places much of its emphasis has been carefully examined. However, regarded as a whole, we find it more damaging than helpful to petitioner's cause. The letters do not impress us as letters written by individuals whose primary aim is profit from the operation of a yacht. Proposals that would have required extensive alterations *103 were immediately discouraged, and when the possibility of a sale entered the picture the negotiation of charters that might interfere with the sale were avoided, unless they were so attractive that they could not be refused. No such charters, however, were offered. We think the correspondence supports, rather than detracts from, our conclusion that petitioner was interested primarily in ridding itself of the yacht and meanwhile in securing charters, if possible, to help defray the continuing expense of maintenance and upkeep. We hold that insofar as such expenses were concerned petitioner was not engaged in a trade or business and that the yacht Savarona was not property used in a trade or business. In drawing our findings of fact we have taken into consideration testimony given by Mrs. Cadwalader under oath on December 6, 1934, in a proceeding in the Bureau of Internal Revenue. Mrs. Cadwalader, who died prior to the hearing in this case, was represented in that proceeding by the attorney who appears as counsel for petitioner in the case at bar. Smith, who was an attorney and petitioner's secretary, also appeared as counsel. Campbell, petitioner's president and treasurer, and who *104 was Mrs. Cadwalader's attorney after 1930, also testified at the hearing. The hearing was concerned with an investigation of the returns of Mr. and Mrs. Cadwalader for the years 1929 to 1932, inclusive, as well as a re-examination of one or more of petitioner's returns. Mrs. Cadwalader's testimony was taken down in shorthand and a verbatim transcript thereof was introduced in the present proceeding upon identification by the stenographer who took it down and transcribed it. The gist of the testimony insofar as it is here material is to negative the assertion that either petitioner was organized or the new Savarona constructed with any intent of profiting therefrom. Petitioner's counsel strenuously objected to the introduction of the testimony largely upon the ground that it was hearsay, and made a motion to strike it, giving assurances that he would demonstrate in his brief the inadmissibility. His main brief, however, is peculiarly silent on this point, and upon reply, after a few remarks going more to the weight of the testimony than to its competency, he concludes with the bare statement that "We think the exhibit incorporating these statements was not admissible and still urge *105 petitioner's objections thereto." We think the testimony was plainly admissible and hereby deny the motion to strike. It makes no difference whether Mrs. Cadwalader is regarded as having been a representative of petitioner acting within the scope of her authority in making her statements, or as a third person, stranger to the instant proceeding. If the former, her statements are competent as admissions, ; ; ; ; Hamel, Practice and Evidence before the U.S. Board of Tax Appeals, p. 296, et seq.; and if the latter, they are admissible as declarations of a deceased person against her pecuniary interest at the time they were made. ; Wigmore on Evidence (3rd Ed.), Vol. V, pp. 265-9; Jones on Evidence (3rd Ed.), pp. 488-9; Hamel, supra, *106 p. 302. It is therefore unnecessary to consider whether they are also admissible as former testimony. See Wigmore on Evidence (3rd Ed.), Vol. V, p. 53. There is every reason to believe her testimony; the facts with respect to which she was examined were peculiarly within her knowledge; she had no motive to falsify; and her testimony was taken under oath, with opportunity to examine afforded to, and exercised by, government counsel and her own attorney. Decision will be entered for the respondent.